Here ye, here ye, this Honorable Appellate Court for the 2nd Judicial District is now in session. The Honorable Ann P. Julianson presiding. Please be seated. Your Honor, the second case on the docket this morning is 2-22-0273, Pamela Fese, individually and as Administrator of the Estate of Joseph Fese, deceased plaintiff Appellant v. Presence Central & Suburban Hospitals Network, doing business at Presence Mercy Medical Center, defendant Appellini. Arguing for the Appellant, Mr. Michael Rapsack. Arguing for the Appellini, Mr. Charles A. Ingram.  Yes, Your Honor. All right. Then counsel, when you're ready. Good morning, Your Honor. Michael Rapsack. I'm here on behalf of the plaintiff Appellant, Pamela Fese, who is the Administrator of the Estate of her husband. This is the case in which the hospital obtained summary judgment in the trial court on the grounds that Dr. Irving, the doctor that treated Joseph, was not and could not be his apparent agent, based upon the consent form that was signed at the hospital. The primary point that we have, and such a very basic, simple evidentiary point, is that we know that the patient did not sign the form. The form was only signed by his wife, and she was not authorized under any format to be a signature, a signatory to the form. And without a valid signature on the form, of course, the form is not valid. The hospital can't rely upon it. How would she have been, what would have made her offer? Power of attorney? She'd have to have a power of attorney, and a power of attorney for health care should do it. She could be a guardian, or she could have an actual contract of some nature, possibly with her husband in some way, which would be somewhat similar to a power of attorney. Those are the only three ways where she could bind him with respect to the question of reliance, what he relied upon. That's the distinction. She might be able to do other things as his spouse, but that's not one of them. Mr. Ratzak, what case do you have where the court previously ruled that a wife was not authorized to sign the form? The primary one would be the CURTO case, C-U-R-T-O. In that case, the court said there is no presumption that a spouse has the authority to bind the other half of that relationship. And that general principle is in Fra Gorgianis as well. That involves a son signing on behalf of his father, but it was the same idea. Wasn't that well after the father was deceased? It was, except in that case the court did not rely upon the fact that the father was deceased. I don't believe. Not unless it's a factual distinction. It was something they considered, but had the father not been deceased, I believe that case would have come out the same way based upon the logic that you cannot bind somebody without authority. I can't walk into a bank and say, I'm my wife's agent. Let me have her money. Nobody would allow that. Counsel, what about it appears in the argument of your opponent that they're arguing that he was capable, he had capacity to authorize her verbally. Putting aside whether or not there's evidence for it, if there was evidence for it, is that a method by which she could have been his agent? Not in this case because that would be, I believe what we're talking about then, because she's not being appointed an agent directly. It becomes apparent authority, and apparent authority in that situation would require the hospital. First of all, it would require Joseph to acquiesce or consent to her exercising under your honors hypothesis. That would be the case. But for apparent authority, the hospital would have to rely upon that as a reason for continuing treatment. And the hospital cannot rely upon that because they have to treat him. That's the other part of our argument. Under EMTALA, I believe that's how you say it, and the state statute, they had a duty, an obligation to treat him no matter what she signed. If you take Justice Kennedy's question, even if it were an issue, it would be an issue of fact for trier effect, would it not? It wouldn't be something that you could rely on by summary judgment. On my side, to be honest, just because I'm contesting summary judgment, I hadn't thought out what would happen if it went back down to the trial court. I think your Honor is saying if it goes back to the trial court, can we get summary judgment? Actually, I think under these circumstances, given that there is no evidence of any reliance by the hospital, and there's no evidence at all that she had any authority, it should be summary judgment on her, on behalf of the plaintiff. But that's an outcome, I believe, to the trial court judge and trial counsel. There may be more evidence. We're at summary judgment stage. There could be something that I don't know that hasn't been brought up yet that didn't have to be brought up. So counsel, as to the form, if the decedent himself had signed it, it seems like the case law is pretty clear, then he would certainly do it. It's a factor. It's not necessarily dispositive, but it seems to be the main factor. If set aside the existence of a consent form, let's say he's brought in off the street with nobody with him, there's nobody signs anything, what's our analysis if that's the case? In that case, the analysis is in terms of the care, one thing, they have to treat him, and two, they can treat him without anybody's consent. But treatment's not the issue here. The question is reliance and holding out. Now, in that situation, somebody brought him to the hospital and unconscious. That's the equivalent to the Monte, M-O-N-T-I, case where the ambulance driver, I believe it, the patient was unconscious, brought the patient to the hospital, and the court said there can't be a parent agency because the MS people chose the hospital, and there's no showing of anything on his part to reject the hospital's care. In other words, there's no issue about holding out there. The hospital wouldn't be able to disprove holding out because they won't have a consent form. Without a consent form, the hospital is going to be stuck with the parent agency, to use a non-legal but accurate term. And that's not a bad result. The whole idea of Gilbert and the whole parent agency idea was equitable, an equitable remedy. I mean, the Supreme Court has pointed that out over and over. These hospitals have set themselves up, and they encourage you to bring people in, especially to the emergency room, and it's not unfair to hold them to their end of the bargain. So if there is some evidence of the incapacity at some point, all right, The timing of the signing I know you had raised in your brief in terms of the care already beginning. Exactly. What other factors are there to show that there is a parent agency, you know, aside from the treatment itself? The other factor, well, in terms of the reliance element, we know that the EMS people relied upon the hospital to provide the care. I don't think that's an issue. In terms of the holding out, other than with the form on one side, with the holding out, he was at the hospital. He was being treated by people he had never seen before. He wasn't there to be treated by any particular doctor. And he was there because the hospital was in the emergency room. I mean, that is the whole. Without the consent form at all, there's no evidence to show that the hospital wasn't holding out. Let me ask you this question. The Giannis case, as Justice Jorgensen talked about, was the timing on that. Is the timing relevant at all? In this case? The timing, yes, it depends on whether the court accepts our other arguments. The timing is relevant because in this case, it wasn't just that the treatment had begun. The malpractice had begun because the diagnosis was made almost within five minutes of the time that he reached the hospital. Do we know when she signed it? It didn't appear in the record to me when she did sign it. It's not. It's deformed. It doesn't have a sign on it. It doesn't have a date on it. I'm sorry, it doesn't have a timeline. And the evidence is she was asked. She said, I don't. She does not even, she being his wife. But she said, well, I moved into a different room, and no one knows when that event occurred. Moved into the big room. Moved into the big room. And that was about, that's when they did the, they tried to do the intubation. I think that was half an hour into this picture. That's the earliest that it could have been done. But there was no evidence at all as to when it was done. Was the witness who signed the form as witness, was she deposed? No. Not to my knowledge. It's not in the record. I don't believe so. Given what happened in the hospital, it doesn't surprise me. But the point is, if the malpractice had begun, and I think there's a presumption at this stage that it had, because once the diagnosis is made, the treatment immediately is to do the cryo-thyroidotomy, and they didn't have him do it. They didn't get somebody else to do it. That would mean that I could, if I'm in a hospital, I could bring a form to somebody that basically relieved them from liability after I made the mistake. I don't think anything in any of the apparent agency cases suggests that it's meant to let a hospital step around its apparent negligence. By the time the ENT got there, was he already deceased? No. I'm trying to remember a specific opinion. They tried to resuscitate him, if you recall. His son tried to resuscitate him, and then when the ENT came, they tried. I don't know that anybody, as a matter of fact, has pinpointed down precisely when it was impossible to save his life. The consensus was that it was possible to save his life up until the point that just when the ENT showed up. When the ENT showed up, it was kind of the opportunity for life-saving methods were gone. It's not gone. It diminished tremendously. I understand it's a delicate subject for the family. I just don't want to. So in terms of the timing, I think the defense has raised that at some point that the decedent had capacity at some point. Your point in terms of that is they could have given him the form. Absolutely. And then they didn't. Now, their counter to that is that if he had capacity to sign the form, he had capacity to authorize his wife to sign. What's your position on that? My position on that is he did not authorize his wife to sign. If he had said, I can't sign this form, honey, would you sign it for me or something of that nature, we would still have some of the other problems we have in that the form did matter because of EMTALA and the state statute. Whether the form was signed or not is completely irrelevant. But putting that aside, it didn't happen. Their argument was that when they were talking to Joseph, they were looking at Pamela. At that point, what they were talking to Joseph about was simply describing what they were intending to do. There was nothing there about I'm giving you authority. Would you sign this document for me? And there isn't anything else in the record that shows he ever even thought about it. And we know he was able to talk because of the very sad last moments before they attempted the surgery. So they should have asked him. They did not. That's fatal to the case. The other point that we have, and it's a shorter point that's in the brief, is simply that Dr. Irving was also an applied agent of the hospital, an actual agent by implication. And that's based upon the fact that he was a medical director. And with that status, he had what the bylaws said was general supervisory authority. And that is a term that I haven't seen in any of the cases that the defense has cited or any other case where an applied agency was denied. That would appear to be about the broadest scope of authority they could give their medical director. And your argument is that that's a question of fact? That's a question of fact. Yes, that's clear. I'm not suggesting that that's definitive. But sure, the question of fact is what that means. So you're submitting then if a wife brings a husband into the hospital and, you know, for lack of a better term, you know, it's just chaos because, you know, they're trying to do life saving, this, that, and the other. She has the authority, the defense is saying she has the authority to sign the lease because the husband is not really, is capable of doing so, if you will. Now, let's take it a couple days, three days later, and the wife picks up the phone to call one of the physicians or to call the insurance company, and they say we're not going to talk to you unless you show us a power of attorney. You're saying that there's no different from that chaotic period to the calm where the wife tries to get some information and can't do so without a power of attorney? That's correct. And anybody who has tried in these circumstances without a POA will find out that no one will talk to you without a POA because of the very strict rules they have about that. It sort of makes sense. We're not allowed to just step in and bind people. The agent is never allowed to make up the principal relationship. It's only up to the principal, and that's always been the solid ironclad law of agency, not just in this situation but across the board. So you've made arguments in the brief about essentially treating this as a contract. Yes. And there's no consideration is your argument. But what if the conception of these consent forms is simply notice? It's not effectively contractual waiver in exchange for consideration. Should we consider the purpose of these consent forms to simply be notice? That would take this case, I think, in a different direction. That's different than any case that I have seen that's addressed this, even in the baseball case, the exculpatory agreement on the baseball ticket. I looked at that again. That court called that a contract. It's an agreement between the parties, and the implication here was that we will treat you, but we want you to sign this form. That sounds like a very poor but contractual relationship. Even if not, they would still have the problem here that if it was only a question of notice, they can't show that she got the notice until after the malpractice had begun, and then the court would have to go and say, the court would have to distinguish Frago Giannis by saying, well, there the patient died, here the patient didn't die. So here we're going to let the hospital essentially bring you into the hospital. We'll start the care. You're going to rely upon us. Everything's fine. And then literally renege on the agreement, renege on what the patient thinks they have coming, which supports my suggestion. It's a contractual relationship. The patient is relying upon the hospital. The hospital is relying upon the patient. It's all part of one arrangement. Unless the court has further questions, I hear my time. Do you have any other questions? Thank you. Thank you. Good morning. Good morning. May it please the Court. Addressing the issue. I'm sorry. Charles Agnew. Charles Agnew. The appellee. The hospital. Good morning. To address the primary argument that Mr. Rathstack puts forth is the idea that there was no authority here when Pamela Feese executed the consent form on behalf of her husband. The only evidence of authority in this case is the evidence from Pamela Feese. Pamela Feese indicated in the consent form itself that she had the authority to execute the consent form. She then, in her discovery deposition, answered the question and indicated and asserted in a sworn statement that she executed the consent form on behalf of her husband. And that's the consent form we have here. Isn't the focus of agency law what the principal did? I mean, the principal has to consent or knowingly acquiesce to the agent's exercise of authority. So what were you saying that the principal did in this instance? By the principal in terms of Mr. Feese, I think, which you're asking, Your Honor. Correct. And I think what we've done here is we've kind of gone off on this tangent that plaintiff has set forth in terms of a contract analysis here. And I think that the Wallace decision, the Putnam decision, both of those are cases that talk about these issues where the plaintiff is attempting to make a contract argument that there's not enforceable terms, that consent form is inoperative because, for example, as counsel asserts, the hospital has to provide emergency treatment. Right. So, Mr. Rangner, if she had said, I'm not signing this, what would the hospital have done? Right. And in that case, it would have probably been an issue of fact as to whether she had noticed. But what the Wallace case says, what the Putnam case says is that we're not considering these contract arguments of plaintiff's counsel. The question under Gilbert and the question under Wallace and Putnam is, was there notice? Was there actual or constructive notice? It's not whether there was an agency such that the agent here, the spouse, was able to bind. It doesn't notice have to be to the principal here or at the very least imputed to the principal through the agent. So whether it's contract or notice analysis, the agent has to be authorized in some way by some action of the principal. So that was my question earlier, which, what are the actions that you're pointing to that justify that agency? Right. And counsel argued that we were bringing up this idea of if Mr. Fesey had capacity, then she was given the authority to execute the consent. That was actually brought up by plaintiff's counsel. I was a little surprised when I saw it in the initial brief that they contended that he was competent to exercise or to consent or sign the consent himself, all the way up until the time that this phycothioretomy was attempted. That was plaintiff's argument. And where we responded, Judge, is in line with the Curto case, kind of, again, falling along those lines of the contract cases, is that she's there. She executes the consent. He's sitting there. If he's competent, as plaintiff contends, then he is acquiescing to the execution of the consent by his spouse. And remember, the situation here is plaintiff is bringing the case individually on her own behalf. The wrongful death count, the family expense count, she's bringing this action. She stands in the emergency department with her husband present and asserts authority to sign the consent. She signs the consent. And now here she is disavowing the consent. Well, she's filing as a ministry of the estate, correct? She's also suing individually, Judge, and the wrongful death action is hers. Yeah. And the family expense action is hers. And the trial court granted summary judgment as to the entirety of this thing, based upon Pamela Feesey's execution of that consent. And I would argue the Monte case, which plaintiff cites, is very interesting in terms of analyzing others acting on behalf of the patient. In Monte, what we have is the court saying, okay, the patient was incapacitated, and so therefore we are allowed to look to the EMS crew and then the spouse as to whether they were seeking care from the hospital. Plaintiff argues that case, but then in regards to the notice provisions of the consent, that case is not arguable on those grounds, but it is. Well, that's the beauty of the law, isn't it? We can make a case, read the way we like. Right. So I would say that Monte says, hey, look, if on a reliance element we can look to family and we can look to the EMS crew, we should be able to do that as to notice, the notice provisions of the consent. And here, again, we have an employee who brings a consent to the room where this patient is being treated, and we have the spouse taking that consent, asserting authority in that consent, and executing the consent on behalf of the patient. And she agrees to that later in her deposition. So is mere presence enough to equal acquiescence? Again, this is... The presence of the decedent in the same room as the purported agent filling out the form. Is his presence enough, or do you need something else? Well, and again, this is kind of going down the line of contract, which Mr. Ratzak has argued. And again, the idea is notice or constructive notice. And I think his presence there with his spouse acting and asserting authority in this consent, I do think is sufficient in order to impose that actual or constructive notice upon the plaintiff in the case, who is also Pamela Fiesen, the one who signed it. I mean, I'm coming at this through just the agency analysis. And by the way, I'm disappointed that neither side cited the restatement somewhere. A law professor is crying. But in that analysis, the principal has to act, whether it's for authorizing an agent to enter into a contract or whether the agent is being authorized to receive notice on behalf of the principal. The principal has to do something. So here we have a presence, right, assuming those facts. Do we have an understanding that the principal knew that the agent was being asked to waive certain rights? Are there any words or conduct indicating consent to either of these propositions? So that's the question I've got for you. Yes, and I guess if you are going to analyze it on those sorts of contract and then authority to bind a principal, we then reference the Curto case, which the plaintiff cites. And our response to that argument, again, is if Mr. Fiesen was indeed capable of consenting or granting the authority for his spouse to consent, he's there. He is capable then through, and the Curto case mentions this. In that case, it was a nursing home arbitration clause that they tried to enforce, unlike what we have here. But in any event, what the court said in Curto is that the patient wasn't even around, wasn't present when the arbitration clause was executed by the spouse. That's not what we have here. The Curto case contemplated a situation like here where the principal would be present and by silence would be acquiescing to the authority of the spouse to sign the form. See, that's my issue. One of my issues is we don't know when and where she was when she signed this form. Had that witness been deposed, we might have had more information. Yeah, and this apparent agency summary judgment motion was brought, Judge, in the course of discovery in the underlying case. And it was brought in the course of discovery in the underlying case because Pamela Fiese asserted in her deposition she had authority, and it was acting on behalf of her husband. She printed out her relationship. She printed out her name, signed her name. But, yes, I understand what you're saying, Judge, but there is no evidence in the case. There is no evidence that's been developed that she executed that consent form. As a matter of fact, she said, I signed nothing after my husband had passed. She did affirmatively state that. But there's no evidence that she executed this consent form after the course of care was completed. And then, again, there's also the line of cases, Wallace, Plutton, Gore. There's others where, and Frazados is one I would refer the Court to, where the care was in the course of being done when the consent form was signed. Right. It seems like timing is not a huge issue in a lot of these cases. It's emergency care. Right. And that's what's going to happen. When there's emergency care, there's going to be a course of care being provided to the patient. But if Mr. Rastak submits that this was asked to be signed after it was clear that malpractice began. Right. And I, again, would ask him what, I mean, that is Mr. Rastak's, I suppose, his finding of fact. I don't think there's evidence of that in this case. I don't think there's evidence that's been developed. Counsel has, again, kind of diminished the emergency nature of this situation and said that he was capable of executing this consent form himself. I, again, I think that is contrary to what the facts that have developed that have been presented to the Court here to consider. Counsel, I'm going to go back to what I was talking about before. Yeah. But in CURTA, which you raised, it says there's no evidence showing that Charles, in that case the decedent, was present when his, I think it's his wife, signed the agreement. Or that Charles understood merely was signing an agreement waiving his legal rights. The record contains no words or conduct by Charles that would reasonably indicate consent. Now, I understand that's a contract, right, strictly contractual. But nonetheless, it's an agency analysis. What did the principal do that authorizes the agent's actions? And in that case, they find there was no evidence he was present. Okay, here he may or may not have been present. But what do we have to indicate that there was some understanding that there was this signature? Or, you know, what words or conduct reasonably indicate his consent? It would be the acquiescence, presence, the accepting the care, continuing. Presence plus silence. Presence plus silence plus what, under that analysis, we're not talking about an arbitration clause here. We're talking about the provision of care, the acceptance and request. That's what I mentioned in my brief for the continuation of care, knowing that his agent has executed the consent form on his behalf. He is then bound by the terms that are contained within that consent form. So I guess the knowing element is what I'm missing here. And, you know, if I look at Fr. Giannis, it says the hospital attempted to rely on the consent form signed by the son. But immediately it says the form has no bearing on this case because the decedent did not sign the form and never knew of its existence. And so here, I mean, arguably you have knowledge by way of presence. But, again, it authorized somebody else to sign it. It doesn't have to be something else from the principal to indicate that they are granting the authority. I would say that we have enough here, Judge, if you're going to use that contract analysis. Again- Well, I'm just thinking the straight agency. Sure. Whether it's contract or simple notice, right? You can't impute notice. You're not arguing that if it's notice only that giving it to the wife imputes that to the decedent, are you? Well- You still have to have the agent receive notice for you. My argument would include the fact that she's bringing a claim individually. So certainly if there's notice to anyone here, there's notice to Pamela Fesey. But in addition to that, Judge, I do think that if you are the alleged principal and you grant the authority to execute a consent form, I think that that, which by your acquiescence or silence, which is what we would argue here if he is deemed competent, then I think that he would be bound by the terms of that consent form, including the notice provisions on independent contractor status. Mr. Enger, if the wife wasn't around and, say, a neighbor had brought him in and dropped him off or followed the ambulance in, and everything's chaotic and the neighbor's there, same circumstance we have here, and they go to the neighbor and say, could you sign this form because you're here with him, would we be having the same argument or would you disagree? I think that there would be- So one of the things that I refer to is the surrogate act. I didn't refer to the surrogate act to argue that she was making an informed consent for treatment decision here in this case. The reason why I argued that is that there is certainly a preference to those who can act on behalf of others under emergency situations for consent. So, sure, that would be more tenuous. That would be more tenuous. I mean, and I'm going to ask Mr. Ratzak, how does a hospital protect themselves on an agency when, you know, you can't have a spouse sign or you can't have someone else sign? Yeah, and those are arguments that are made in the brief. There is certainly a policy aspect to this or a public policy interest in this. This is happening in emergency departments where spouses are trying to help their sick loved ones by executing these consent forms. But on the flip side, you have a loved one, a spouse, calling the insurance agency and they say, do you have a power of attorney? We can't give you any information. Or calling the hospital the next day and they say, do you have a power of attorney because we can't talk to you. So what's the diff? If I'm just responding past the time, I would just say that, again, we kind of are going down this path of agency and express authority to execute. Again, it's the question of notice, actual or constructive notice. And I think what we have here is sufficient to be able to preclude plaintiff from claiming that holding out aspect under Gilbert. Due to the emergency nature of what's going on? The emergency nature of what's going on. And plaintiff here, named individually plaintiff, executing and asserting their authority to execute this consent to our employee who's presenting them with that consent form. I just have one question on that point. What other factors are there? Obviously consent form, very important factor, may or may not be this positive, but what other factors are there to put a patient on notice? I've seen other cases where there are signs, lab coats, ID cards are considered. What else is there in this case? Nothing. There was no argument in terms of a sign. There was no argument on badges. There was no, I'm sorry, there was no evidence developed on badges. You talked about signs. There's no evidence of a sign. But again, well, I don't want to go off and do a tangent. No, I just wanted to make clear. I mean, so it's the consent form is the notice. There's no additional notice that the hospital is claiming. That's right. There's no advertisements at issue here or anything like that. All right. And was there any reason why the witness was not deposed, the witness to the signature? Unavailability? No, there was no logistical reason for that. Is this somebody who's got to come in at trial? Do we know? If it were to happen, yeah. Yeah, it's somebody who supposedly could, Judge. No, not that I'm aware of. Was that a hospital employee? It would have been a hospital employee. Any additional questions? Thank you. Thank you. Again, good morning. Just before I begin, I just had a couple of brief points. But this wasn't a chaotic emergency room situation, if you recall. This was or was not? I'm sorry. It was not a chaotic emergency room situation. The family was sitting there simply waiting for the doctor to do something, and he was struggling to breathe. This wasn't the situation that you see on some TV shows or movies where everybody's scrambling. They were trying to do these. It's not clear why they waited so long, but they had plenty of time to think, plenty of time to act. They had at least a half an hour to talk. Waited so long for what? They were waiting for the doctors to do something. Oh, okay. So waited so long to do something versus waited so long to get an authorization. Correct. I'm sorry. Yes. The family and the patient were waiting for the doctor to act upon the diagnosis, and no one was acting for about a half an hour. At any time, somebody could have asked the patient, is this okay? This is where our situation is.  This is the hospital's burden. If they're going to rely upon the consent form, then the burden falls upon them to show that the consent form is actual. And in answering, I think the answer came up in the argument after I stepped down, Justice Kennedy's question about notice. Even if notice was possible to cure everything here, the notice has to be to the patient. It doesn't have to be to the principal. It can't be notice to somebody who's not the patient's agent. If they had come in and said something to her, here, sign this form, this is what's on it, it still wouldn't be binding on anybody. And there is no evidence that she signed any form while she was sitting there and he was watching her. It's simply not in the record. And if that's the position, that's just incorrect. Well, how about his statement regarding her deposition? Oh, that she, I'm sorry, that she acted, she said that on his behalf? Yes. Yes. Going back to the little analogy I just made, if I walked into a bank and said I'm signing a document, I'm acting on behalf of my wife, that's not good. You can't decide yourself to act for somebody. I can't decide. When you say I sign with authority and the principal is sitting there and does not object to that, it's either to my conduct or my words. Now Your Honor is talking about apparent authority between the patient and his wife. To do that, you'd have to show that that occurred and there isn't any evidence that he was sitting there listening to her while she... Wasn't it, I'm sorry, I thought I misunderstood, that you said he was competent during this period of time. Yes. But there's no, I'm sorry. Go ahead. There's no evidence that the document was signed in front of him or he was aware the document was being signed. That's the best way to put it. It just isn't. All we have is a document. We don't even know... Can you imagine a situation where the patient would be aware of the signing of a consent form in an emergency room? Yes, if the patient, yes, if the person signing on behalf of the patient was with the patient, which would have to be the case to give notice to the patient, the patient presumably would ask or know what's being signed or being told. I would argue that if the patient doesn't know what's being signed, then the patient can't possibly give authority to that person to sign. That's the bottom line. I guess that's my question. If you're a patient in an emergency room, how would you ever be in a position to comprehend what's being signed? Someone would have to tell you what is being signed, either the person bringing the form in or the person signing. But I'm saying that to you, how do I know you're understanding it? How do I know you're receiving that information? You are, after all, on a gurney in an emergency room, be treated for an emergency medical problem. How would that ever be accomplished? That would be simply a question of fact by asking the people who were present, what was the condition of the patient at the time? Was the patient able to understand what was going on? In this case, But able to understand and did understand, that's more than a nuance. Did understand would then become a question of fact for the jury. All the people can do is put the circumstances together and say, did RASCAC really, he was there, he listened, he saw, he heard, did he understand? And then we're talking about mental competence, hearing, all kinds of things. But that would be a question of fact. I mean, that would still assume that this happened, that this event happened if RASCAC is the patient in front of me. And there isn't any evidence here that that was the case. That's the bottom line. So your position is there is no way for the hospital to protect themselves with respect to agency unless the individual signed it himself or gave consent to be signed by someone else? That's correct. That is the law. That's current. That's Barbara's office. That's every case I've seen. And the restatement wasn't mentioned, but the restatement says the same thing. The principal, only the principal can authorize this. The agent can never make himself an agent. I'm going to let the beeper go off unless the Court has further questions. Any further questions? Thank you very much. Thank you. Gentlemen, thank you both for your arguments this morning. And we are in recess until 1130.